# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: Andrea Nicole Tinsley, | Case No. 25-12971-MER |
| Debtor. | Chapter 13 |

## CREDITOR'S OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN

Creditor Roaring Fork Neurology, P.C. d/b/a NeuroSpa ("Creditor"), by and through undersigned counsel, hereby objects to confirmation of the Chapter 13 Plan currently pending confirmation (the "Plan") and in support thereof states as follows:

1. The Plan was not proposed in good faith pursuant to 11 U.S.C. § 1325(a)(3).

2. Additionally, the Debtor's petition was not filed in good faith as required under 11 U.S.C. § 1325(a)(7).

3. Finally, it is not clear as to whether all of Debtor's disposable income is going to creditors under 11 U.S.C. § 1325(b)(1)(B).

### Background

4. On March 17, 2025, Creditor filed a Complaint for Damages and Injunctive Relief (the "Complaint") in the District Court of Pitkin County, Colorado, Case No. 2025CV30025 (the "State Court Action"), arising out of Debtor's civil theft of $133,896.32 in funds from Creditor. *See* **Exhibit 1**, Complaint.

5. On May 13, 2025, Creditor filed a Motion for Entry of Default Judgment against Creditor in the State Court Action, after attempting to confer with counsel for Debtor regarding the same.

6. It was apparent that, based on Debtor's lack of response to the Motion, default was a strategic attempt to avoid civil discovery and preserve the Debtor's 5th Amendment rights.

7. Nevertheless, shortly after the Motion was filed, on May 16, 2025, Debtor filed her petition for Chapter 13 bankruptcy, in a further attempt to cease civil litigation and enforcement efforts arising out of her undisputed theft of funds.

8. On June 18, 2025, Creditor filed her Proof of Claim against Debtor's estate in the amount of $437,164.13.

## Disposable Income and Expenses

9. First, it is unclear as to whether all of Debtor's disposable income is included in the Plan as required by 11 U.S.C. § 1325(b)(1)(B). Creditor joins in the Chapter 13 Trustee's Objection in this regard and requests additional documentation in the form of Debtor's bank account statements for the 6-month period prior to filing.

10. Additionally, Debtor should explain why her projected income under Schedule I for employment with Peak3, LTD ($8,003.34 per month, gross) significantly differs from that of her Statement of Current Monthly Income ($7,046.46 per month, gross).

11. Creditor also requests documentation of the following itemized expenses in Schedule J, which may be overstated:

    a. Telephone, cell phone, Internet, satellite, and cable services of $300.00;

    b. Food and housekeeping supplies of $1,155.00

    c. Childcare and children's education costs of $2,718.00

    d. Medical and dental expenses of $125.00, especially as Debtor represents that her spouse pays for health insurance;

    e. Transportation costs of $275.00;

    f. Vehicle insurance of $180.00;

    g. Car payments of $704.96;

    h. "NFS car payment" of $820.00;

    i. "NFS motorcycle" of $270.00;

    j. "NFS vehicle insurance" of $179.00;

    k. "NFS Student Loan payment" of $100.00;

    l. "NFS Debt payment" of $739.00. Debtor has also insufficiently explained what this "Debt" payment is for;

    m. "NFS Upgrade payment" of $466.00. Debtor has also insufficiently explained what this "Upgrade" payment is for; and

          n. "NFS Medical payments" of $200.00. Debtor has also insufficiently explained what these "Medical" payments are for.

12.     If these expenses are overstated and/or invalid, more funds may be available to pay creditors. Accordingly, Creditor requests proof of the same.

13.     Creditor also objects to the characterization of Debtor's "Luis vuitton Purse" [sic] and "Gucci purse" as exempt "necessary wearing apparel" of the Debtor under C.R.S. § 13-54-102(1)(a). The value of such "necessary wearing apparel" should be provided to creditors. Moreover, Creditor requests proof of the value of these assets.

## Bad Faith

14.     Creditor objects to the Plan, as it was not filed in good faith as required under 11 U.S.C. § 1325(a)(3). Moreover, the filing of the Debtor's petition itself was not done in good faith, such that Creditor also objects under 11 U.S.C. § 1325(a)(7).

15.     "In order to determine whether a Chapter 13 plan was filed in good faith under § 1325(a)(3), the Tenth Circuit historically applied the following non-exhaustive list known as the *Flygare* factors:

> (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden on which the plan's administration would place upon the trustee.

*In re McDonald*, 508 B.R. 187, 205-06 (Bankr. D. Colo. 2014).

16. Almost thirty years after *Flygare* was decided, the Tenth Circuit in *Cranmer* noted the Bankruptcy Code was amended to include § 1325(b), which subsumed most of the *Flygare* factors and gave the good faith inquiry "a more narrow focus." Consequently, a bankruptcy court must consider the three *Cranmer* factors, including "whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code … This Court also notes that proposing a Chapter 13 plan in good faith under § 1325(a)(3) is a factor to consider in the totality of circumstances analysis under § 1307(c); however, it is not a standalone issue in the context of dismissal under § 1307(c) for alleged bad faith conversion to Chapter 13. Clearly, there is an overlap between certain factors analyzing these provisions of the Bankruptcy Code." *Id*.

17. Here, it is clear that the Plan was proposed in bad faith, and that the Debtor's Chapter 13 petition was also filed in bad faith.

18. First, the Debtor's stated income, expenses and exemptions, as discussed above, are suspect, without additional clarifying information.

19. Of particular importance, however, is the Debtor's motivation and sincerity in seeking Chapter 13 relief. Frankly put, there is no such sincerity.

20. The timing of the Chapter 13 bankruptcy, immediately after Creditor filed her Motion for Default Judgment in the State Court Action, was clearly an effort to cease civil litigation and collection efforts against her by Creditor, arising out of the undisputed theft of funds.

21. Creditor is the Debtor's main creditor and holds non-dischargeable debt for civil theft, embezzlement and fraud under 11 U.S.C. §§ 523(a)(2), (4) and (6). Debtor causes significant harm to Creditor through this filing and the Plan itself, paying unsecured creditors next to nothing, forcing Creditor file a forthcoming dischargeability adversary proceeding, and, astonishingly, claiming exemptions on designer purses and other items to apparently continue her extravagant pre-petition lifestyle.

22. There is also the issue of bad faith filing of the bankruptcy itself, which prevents confirmation of the Plan under 11 U.S.C. § 1325(a)(7).

23. "Generally, 'in determining whether a Chapter 13 petition has been filed in bad faith under Section 1307(c), the bankruptcy court must consider the totality of the circumstances.'" *In re Johnson*, 2021 WL 6053832, at *9 (Bankr. D. Colo. Dec. 15, 2021). The "totality of the circumstances" approach focuses on whether there has been an "abuse of the provisions, purposes, or spirit of [the Bankruptcy Code]." *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993).

24. The Tenth Circuit, in *Gier*, enumerated the following seven factors as relevant to a bad faith filing inquiry:

> (1) the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; (2) the timing of the petition; (3) how the debt arose; (4) the debtor's motives in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors both before and after the petition was filed; and (7) whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1329.

25. The timing of the petition, again, shows bad faith, and that the motive in seeking relief under the Bankruptcy Code is not sincere. Rather, Debtor appears to wish to pay pennies on the dollar to Creditor, among others, over a period of years *after* she stole thousands of dollars to fund her Aspen, Colorado lifestyle. The nature of the debt to Creditor, the pre-petition treatment of the Creditor, and the effect of this filing on Creditor, therefore, also weighs heavily against Debtor.

26. Additionally, many of Debtor's purported expenses are unclear and potentially duplicative (for example, multiple car payments and vehicle insurance payments, unspecified medical and other "debt" expenses). It does not appear that Debtor has been forthcoming with this Court about the nature of her assets and liabilities.

27. Creditor reserves the right to amend her objection and to conduct discovery into the issues raised herein.

WHEREFORE, Creditor respectfully requests that this Court deny confirmation of the Plan, dismiss or convert this matter into a Chapter 7 proceeding, and for such other and further relief as this Court deems just and proper.

Dated: June 20, 2025.

Respectfully submitted,

*/s/ Bailey C. Pompea*
Jeffrey A. Weinman, Esq.
Bailey C. Pompea, Esq.
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.

        1600 Stout Street, Suite 1900
        Denver, Colorado 80202
        (303) 534-4499
        jweinman@allen-vellone.com
        bpompea@allen-vellone.com

        *Counsel for Creditor, Roaring Fork Neurology, P.C. dba NeuroSpa*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the forgoing was served on all counsel of record, pursuant to Fed.R. Bankr.P and the L.B.R, by filing the same through CM/ECF on June 20, 2025.

*/s/ Bailey C. Pompea*
Allen Vellone Wolf Helfrich & Factor P.C.

# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, PITKIN COUNTY<br>Court Address:<br>506 E Main Street<br>Aspen, CO 81611 | ▲COURT USE ONLY▲ |
| **Plaintiff:** Roaring Fork Neurology, P.C., d/b/a NeuroSpa<br>v.<br>**Defendant:** Andrea Tinsley f/k/a Andrea Klug-Napier | |
| **Plaintiff's Attorneys:**<br><br>Name: Beth Klein, 17477<br>Address: Klein \| Frank, P.C.<br>350 Market Street, Suite 310<br>Basalt, CO  81621<br>Phone No.: 303-448-8884<br>Fax No.: 303-861-2449<br>Email: beth@kleinfrank.com | Case No.:<br>2025CV030025<br><br>Div:            Crtrm: |
| **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** | |

    Plaintiff Roaring Fork Neurology, P.C. d/b/a NeuroSpa ("NeuroSpa") submits its Complaint for Damages and Injunctive Relief.

<u>Parties</u>

1.    Plaintiff Roaring Fork Neurology, P.C., d/b/a NeuroSpa, is a Colorado corporation doing business in Pitkin County at 426 E Main St #1A, Aspen, CO 81611.

2. Andrea Tinsley f/k/a Andrea Klug-Napier ("Defendant") is a resident of Pitkin County residing at 115 Paepcke Dr. Unit 102, Aspen, CO.

## Venue and Jurisdiction

3. Jurisdiction is proper in this Court has the tortious conduct giving rise to the claims occurred in Colorado.

4. Venue is proper as the Defendant is a resident of Pitkin County and the tortious conduct giving rise to the claims herein occurred in Pitkin County.

## Factual Background

5. Defendant was hired on January 18, 2021. Defendant was responsible for marketing and administrative tasks for NeuroSpa.

6. Defendant developed and operated the NeuroSpa online store at www.theneurospa.com (SHOP tab) on SquareSpace

7. Customers of NeuroSpa purchase skin care products, gift certificates, and prepay for services through this online store.

8. Beginning in 2021, NeuroSpa held special online only sales events several times a year: Labor Day, Black Friday, and Spring and Summer events.

9. These sales events generated large sums of money for NeuroSpa, and all proceeds from these sales belonged to NeuroSpa and were to be paid to NeuroSpa.

10. Defendant created the logistics for these on-line sales events and the merchant website in general

11. To receive payments, Defendant established an online Merchant Payment/Payout account through Stripe to both collect payments from customers and to route those payments from our online store to the NeuroSpa Alpine Bank account ending in -7743.

12. At no time was the Defendant authorized to take any money from these sales for her personal use.

13. At no time was the Defendant authorized to create multiple Stripe accounts.

14. At no time was the Defendant authorized to funnel payments for NeuroSpa products and services to her personal bank accounts and debit cards.

15. At no time was there ever an agreement that Defendant could divert any NeuroSpa funds for her personal use.

16. On February 13, 2025 a meeting was held regarding the Defendant's unacceptable behavior in arranging a photo shoot at NeuroSpa's spa and medical practice which is strictly forbidden.

17. Defendant separated from NeuroSpa on February 16, 2025.

18. After the Defendant's separation, Stripe notified NeuroSpa that two Stripe accounts linked to NeuroSpa's online store were closed.

19. The account numbers are:  1PdD90K58zKwa49D and 1OtyHkFWrOvRgaxM.

20. The Defendant had "closed" them on February 13, 2025 within two hours of the review meeting concerning the Defendant's unacceptable behavior.

21. Upon investigation, it was discovered that Defendant created multiple unauthorized Stripe accounts to link to www.theneurospa.com online store  through SquareSpace from 2022-2025.

3

22.     Upon request the Stripe Support team identified an additional 5 accounts, including an account linked to a MindBody account. MindBody used to be NeuroSpa's scheduling and payment software from 2021-2023.

23.     As of the date of this filing NeuroSpa has discovered the transactions on Exhibit A in the amount of $133,896.32 that were made on Stripe accounts where Defendant diverted funds away from the NeuroSpa Bank account to bank accounts and debit cards owned by the Defendant and others.  The investigation is ongoing, and there may be more.

24.  In addition to diverting funds belonging to NeuroSpa, the Defendant has sole access to the NeuroSpa VistaPrint account that holds business cards, brochures, and paper advertisements.  This account is linked to the NeuroSpa credit card.  Defendant has prevented NeuroSpa's full access its own account.

25.     The Defendant has prevented NeuroSpa from accessing NeuroSpa's Canva Account.

26.     The Defendant has prevented NeuroSpa from accessing NeuroSpa's Google Analytics for [www.theneurspa.com](www.theneurspa.com).

27.     The Defendant has refused to return property belonging to NeuroSpa including video, photos, and marketing materials.

28.     On information and belief, the Defendant has taken HIPPA protected patient information from Neurospa.

29.     All staff at NeuroSpa are trained in physician patient privacy laws and procedure and is certified annually.

30. The Defendant through her NeuroSpa training is aware that HIPPA protected patient information must not be shared and must remain secure and confidential.

## First Claim for Relief
## CIVIL THEFT

31. All prior allegations are incorporated by reference.

32. NeuroSpa owned all the revenues from its sales.

33. The Defendant knowingly, without authorization, and/or by deception took money from NeuroSpa's sales by diverting funds from sales account to her personal possession.

34. The Defendant did so with the intent to permanently deprive the NeuroSpa of the use or benefit of NeuroSpa's revenues and funds.

## Second Claim for Relief
## INJUNCTIVE RELIEF

35. All prior allegations are incorporated by reference.

36. The circumstances giving rise to this action stem from the Defendant's intentional conduct and theft of at least $133,896.32 from NeuroSpa.

37. NeuroSpa will continue to suffer damages without orders prohibiting and/or limiting the Defendant's use and possession of patient information.

38. NeuroSpa will continue to suffer damages without orders prohibiting the Defendant's use NeuroSpa's of tax ID numbers for NeuroSpa and the social security numbers of its owners.

39. NeuroSpa will continue to suffer damages without order prohibiting the Defendant from using NeuroSpa's online accounts and ordering the user ID's and passwords to be provided to NeuroSpa.

38. NeuroSpa will continue to suffer damages without full access to their websites, their marketing materials.

39. NeuroSpa will suffer irreparable harm unless an injunction issues.

40. The injury to NeuroSpa from the Defendant's actions outweigh any harm to the Defendant the injunction may cause, if any.

41. The injunction will not adversely affect the public interest, and in fact supports the interests of the public.

42. NeuroSpa is entitled to an order in the form of injunctive relief requiring Defendant to fully comply and cooperate with protecting the privacy of NeuroSpa patients and restoring access to websites and marketing property belonging to NeuroSpa.

43. The balance of equities favors an injunction entered against the Defendant as follows:

> **CEASE AND DESIST from**
> a. Using NeuroSpa's name and company's assets, accounts, TIN and identity FOR ANY PURPOSE.
> b. Using the Social Security number of the owner of NeuroSpa FOR ANY PURPOSE.
> c. Using patient contact, identity, medical histories, and financial information.
> d. Defaming NeuroSpa and its owner.

    e.    Using NeuroSpa's Stripe account or any on-line payment service to create additional personal accounts where NeuroSpa's funds and online sales can be diverted.

    f.    Setting up dummy accounts mimicking or redirecting on line sales from www.theneurospa.com.

**BE COMPELLED TO**

    a.    Provide all user names and passwords to permit your full access to NeuroSpa's Vistaprint account, Canva account, and Goggle Analytics for www.theneurospa.com.

    b.    Provide all marketing documents and designs that she was paid to generate for NeuroSpa in native format.

    c.    Provide all photographs and video produced to market NeuroSpa in Defendant's possession, custody and/or control.

**WHEREFORE**, in addition to the injunctive relief requested, NeuroSpa prays this honorable Court enter judgment in their favor against Defendant and award the following damages:

a. All actual damages in an amount to be proven at trial including the return of all funds stolen (including all bank charges, interest and fees for any transfer of company funds stolen from your company) from your company times three plus attorney's fees.
b. All costs of litigation
c. Pre-judgment interest at 9% or the applicable statutory rate
d. Punitive damages per subsequent Amendment order of the Court.
e. Such other relief as allowed under Colorado law that is proper and equitable.

7

March 17, 2025

        KLEIN | FRANK, P.C.
         *Original signature on file at Klein | Frank, P.C.*

         */s/ Beth A. Klein*
        Beth A. Klein
        Attorneys for Plaintiff